**MITCHELL ENERGY CORPORATION,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent (two cases).

Nos. 75–1118, 75–1664.

United States Court of Appeals,
Fifth Circuit.

Sept. 15, 1975.

Homer J. Penn, Houston, Tex., Frank P. Saponaro, Jr., Washington, D. C., for petitioner.

Drexel D. Journey, Gen. Counsel, George W. McHenry, Jr., Acting Sol., M. Frazier King, Atty., Federal Power Com'n, Washington, D. C., for respondent.

Before BELL, CLARK and RONEY, Circuit Judges.

BELL, Circuit Judge:

Mitchell Energy Corporation seeks review of an order of the Federal Power Commission rejecting in part a proposed increased rate filed by Mitchell with the Commission. It was the position of the Commission that the increased rate was in conflict with Opinion No. 649 of the Commission approving an earlier settlement agreement allowing Mitchell special relief from area rates. The increased rate was therefore rejected to the extent of the conflict. We affirm but for a different reason.

In the *Other Southwest Area Rate Proceeding*, 46 F.P.C. 900 (1971), *aff'd*, 5 Cir., 1973, 484 F.2d 469, Mitchell sought special relief from the proposed area rate ceiling for its natural gas wells located within the Wise County area of

Texas. The hearing officer rejected its request and suggested that Mitchell instead seek such relief in a special proceeding following the establishment of area rates. Mitchell did not appeal this decision. Following the issuance of Opinion No. 607, which set the Other Southwest Area rate ceilings,[1] Mitchell filed its petition in August, 1972 for waiver of those ceilings on gas sold by it from the Wise County area to Natural Gas Pipeline Company of America, in accordance with the provisions of the rate order in Opinion No. 607 allowing special relief.[2]

After a hearing in November, 1972 all parties, including the Commission staff, entered into settlement negotiations as provided in the Commission's Rules of Practice and Procedure.[3] These negotiations resulted in a Settlement Proposal, concurred in by all parties, which Mitchell submitted to the Commission on December 15, 1972. The Commission approved the Settlement Proposal in its Opinion No. 649 on February 21, 1973. *George Mitchell & Associates, Inc.*, 49 F.P.C. 424 (1973), *remanded sub nom.*

*MacDonald v. FPC*, 1974, 164 U.S.App. D.C. 248, 505 F.2d 355. The settlement included an amendment dated July 5, 1972 to the original 1954 Gas Purchase Agreement between Mitchell and Natural and their predecessors.

The settlement provided that Mitchell would receive 30 cents per Mcf[4] with a 25 cent plant dehydration allowance,[5] without any upward Btu adjustment[6] but with a downward Btu adjustment until 1977, for all gas sold by it to Natural subject to the terms of the amended contract. Prior to the settlement Mitchell had been receiving a weighted average of 18.859 cents per Mcf, based on the area rate ceiling of 18.7 cents for flowing gas and 24 cents for new gas, as established by the *Other Southwest Area Rate Proceeding, supra*. The reasonableness of this above-ceiling rate is not before this court, but was explicitly considered by the Court of Appeals for the District of Columbia in *MacDonald v. FPC, supra*, in which the court remanded the case to the Commission for additional findings of fact in support of the order.

---

1. This was affirmed by this court in *In re Other Southwest Area Rate Case*, 5 Cir., 1973, 484 F.2d 469.

    The rate order is set forth in 18 C.F.R. § 154.109a, as amended by Opinion No. 607–A, 47 F.P.C. 99 (1972).

2. 18 C.F.R. § 109a(e) provides:

    Prior to July 1, 1976, any seller seeking to charge a rate in excess of the applicable area rate or requesting a change in the applicable area rate must file a petition for waiver or amendment of this section pursuant to § 1.7(b) of the Commission's rules of practice and procedure in this chapter (18 CFR 1.7(b)) fully justifying the relief sought in the light of this opinion and order. Prior to July 1, 1976, the seller may not file any rate increase in excess of the applicable area rate herein prescribed unless and until the Commission grants the petition.

3. 18 C.F.R. § 1.18 provides, in pertinent part:
    Conferences; offers of settlement.
    (a) *To adjust or settle proceedings.* In order to provide opportunity for the submission and consideration of facts, arguments, offers of settlement, or proposals of adjustment, for settlement of a proceeding, or any of the

issues therein, or consideration of means by which the conduct of the hearing may be facilitated and the disposition of the proceeding expedited, conferences between the parties to the proceeding and staff for such purposes may be held at any time prior to or during such hearings before the Commission or the officer designated to preside thereat as time, the nature of the proceeding, and the public interest may permit.

4. Thousand cubic feet

5. Mitchell contracted in the original 1954 Gas Purchase Agreement to construct and operate a plant to dehydrate gas delivered to Natural, for which Natural agreed to pay a fixed sum of .25 cent per Mcf "in addition to all other sums . . . to be paid by Buyer to Seller." Revised Gas .Purchase Agreement dated July 12, 1954, Art. VII, § 8.

6. Natural gas contracts customarily provide for proportional adjustment of the contract price for higher or lower Btu content of the natural gas actually delivered relative to some standard Btu content per cubic foot. The Commission also authorizes such adjustments in its area rate orders. *See e. g.*, 18 C.F.R. § 154.105(e)(1)(i) (1974).

The above ceiling rate of 30.25 cents per Mcf was justified primarily on a non-cost factor, *i. e.*, the need to develop fully for interstate use the natural gas resources in the Wise County area, which the Commission felt would not be so utilized absent such rate relief. The purpose of the higher rate was to generate internal capital for further exploration of both these and other gas resources within the continental United States. Thus, the principal *quid pro quo* for the allowance of the higher rate on all of Mitchell's production from the Wise County area wells was Mitchell's commitment to spend approximately $16.5 million in drilling 125 additional wells and building additional compression facilities in that area, and to expend remaining monies for exploration within the continental United States.

There was no express moratorium on subsequent applications by Mitchell for rate increases under Section 4(d) of the Natural Gas Act, 15 U.S.C.A. § 717c (1963). Neither was there express authority for such applications in the contract or the settlement agreement as approved. There were, however, express provisions of the settlement and the contract regarding future price raises. The Commission approved a contractual provision for an automatic periodic price escalation of 1 cent per Mcf every five years beginning in 1977. The contract also included a provision authorizing a redetermination of the contractual base rate, initially set at 30 cents per Mcf as discussed above, every five years, also beginning in 1977.[7] The periodic one cent escalation was expressly made subject to this latter provision for periodic redetermination of the base rate.

Shortly after the settlement was approved, the Commission began hearings to establish a national rate for newly discovered gas committed to the interstate market, which culminated in the issuance of Opinion No. 699 in June, 1974, setting the rate, *inter alia*, for gas from wells drilled after January 1, 1973 at 43 cents per Mcf, subsequently raised to 52 cents per Mcf in Opinion No. 699–H.[8] By the terms of Opinion Nos. 699 and 699–H, all wells drilled by Mitchell after January 1, 1973 were apparently eligible for this higher rate, if otherwise contractually authorized. Mitchell first filed an amendment to its contract in August, 1974, authorizing an increase of the base rate to the applicable area or national rate if higher than the current base rate. Mitchell then filed a notice of a proposed rate increase pursuant to the terms of the contract amendment and Opinion No. 699. This increase was rejected in part by the Commission insofar as it related to interests that were covered by Opinion No. 649. The Commission suggested that Mitchell could "withdraw" from the settlement agreement if it desired the benefits of Opinion No. 699 and that

> if the withdrawal is accepted [by the Commission], the rate increase [on "new" wells] and the rate decrease [on "old" wells] will be made effective as of the same date. In the meantime, however, Mitchell has no right to seek a rate for new gas above its settlement rate, while it continues to enjoy the benefits of the settlement insofar as it relates to flowing gas.

Thus, to gain the higher rate on its twenty or so new gas wells, Mitchell had to give up the above-ceiling rate on all its old wells, numbering in the hundreds.

---

**7.** This provision was in the original 1954 agreement. Revised Gas Purchase Agreement dated July 12, 1954, Art. IX, Part B, § 4(b). Because the original contract term of 20 years was changed to 40 years, running from December 27, 1957, the first occasion under the amended contract will be in 1977.

**8.** The National Rate Cases actually comprise a series of Commission orders issued in the Na-

tional Rate Proceeding, Docket No. R–389–B, which have not been officially reported. Various appeals of these orders were consolidated for review by this court under the title *National Rate Cases for New Gas*, No. 75–3330. The decision in that case, which is now pending in this court, is not relevant to our decision here, in light of our interpretation of Mitchell's Settlement Agreement.

Mitchell filed for a rehearing which was denied. In doing so, the Commission further amplified its position:

> Mitchell's suggestion that it was entitled to amend its contract subsequent to the approval of the settlement so that it could collect a rate above its settlement rate is incompatible with the factual setting and overall purpose of that settlement. Accordingly, while there is no express moratorium set forth in the settlement opinion, there is also nothing contained therein to support Mitchell's view that it should be permitted to amend its contract. Indeed, the contrary, if not explicit, is clearly implicit.

The implicit support for such a position was found in the terms of the settlement price increase, which was and is substantially above the area rate ceiling for flowing gas. The Commission also contrasted the pricing provision for gas from the 125 wells to be drilled within the Wise County Area (which was to be the contract base rate) and the pricing provision for gas to be offered to Natural from the other wells to be drilled within Texas (which was to be sold at "competitive" rates). The agreement by Mitchell not to use the contract's Btu adjustment clause for five years was also considered supportive of the Commission's position.

Mitchell's main contention before this Court is that the Commission has imposed an indefinite, implicit, and therefore unlawful moratorium, not found in the terms of the settlement agreement or Opinion 649, by its allegedly wrongful rejection of the supplemental rate filing, ostensibly contractually authorized by the 1974 amendment. The Commission asserts that the supplemental rate filing was properly rejected as being patently inconsistent with the terms of the settlement agreement, which established a price allegedly not subject to any change until December 1977 and then only to a one cent increase. The issue before this court is whether Mitchell, within the terms of the contract and the settlement agreement between it and Natural, as approved by the Commission, is bound not to change its rates, other than by the terms of that agreement and contract for any period of time, either definite or indefinite.

The standard by which we interpret this settlement agreement and the opinion approving it was well stated by Chief Judge Brown for the court in *Texas Eastern Transmission Corporation v. Federal Power Commission*, 5 Cir., 1962, 306 F.2d 345:

> The case boils down to the one [principle of law] simply stated: what did the parties mean? . . . [citation omitted]. We must recognize, of course, that here, as in every situation of contract interpretation, the Court must put itself in the position of the parties. [citations omitted]. That means that we must read the agreement in the setting of the Natural Gas Act. This includes the relative rights and duties of parties to the underlying transactions and the nature and scope of the controversies out of which this hoped-for solution came into being.
>
> \*   \*   \*   \*   \*   \*
>
> . . . For Commission approved voluntary settlements are an important and desirable mechanism . . . . Consequently settlements should be encouraged, not discouraged. . . . [O]ne sure way to discourage voluntary settlements is for the Commission, at the behest of one party or the other, or the ubiquitous intervenors, to read into contracts things which are simply not expressed or not there, out of the thoroughly commendable (and understandable) feeling that unless that is done the result is not as good as it ought to have been. This is particularly true in this area where, as was the case here, the proposed settlement is subjected, as it should be, to the closest scrutiny by the Commission and its staff. . . . Consequently, both in its substantive provisions and in the terminology sought to memorialize the undertaking, the parties ought to be able to accept the contract as drafted, executed and approved. It

should stand for what it says. 306 F.2d at 347–48.

This standard has been cited with approval by the Court of Appeals for the Tenth Circuit in *Amoco Production Co. v. FPC*, 10 Cir., 1972, 465 F.2d 1350 and *Continental Oil Co. v. FPC*, 10 Cir., 1967, 373 F.2d 96, by the Court of Appeals for the District of Columbia in *City of Chicago v. FPC*, 1967, 128 U.S.App.D.C. 107, 385 F.2d 629, 640, and by the Sixth Circuit in *Texas Gas Transmission Corp. v. FPC*, 6 Cir., 1971, 441 F.2d 1392. *See also Texas Eastern Transmission Corp. v. FPC*, 5 Cir., 1969, 414 F.2d 344, 349; *Tennessee Gas Pipeline Co. v. FPC*, 1974, 164 U.S.App.D.C. 130, 504 F.2d 199 (per curiam); *Amoco Production Co. v. FPC*, 10 Cir., 1973, 491 F.2d 916, 920.

The Natural Gas Act provides that producers subject to the jurisdiction of the Act shall have the initial right to arrange contractual relations between themselves and their customers. With respect to increases in rates under existing contracts, a prospective price increase must be filed with the Commission at least 30 days prior to its effective date to give the public notice of the proposed change. 15 U.S.C.A. § 717c(d) (1963). The Commission may suspend the effectiveness of the increase for up to five months and conduct investigations into the reasonableness of the proposed rate increases. 15 U.S.C.A. § 717c(e) (1963). After that time, if the Commission has failed to take action, the rate becomes effective subject to possible refund liability if the Commission subsequently determines that the rate is too high. *Id.*

■ Thus, a natural gas producer has an absolute right to file a proposed rate increase, subject to any effective rules or orders of the Commission, so long as the increase is contractually authorized. *United Gas Pipeline Co. v. Mobile Gas Service Corp.*, 1956, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed.2d 373. The Commission may reject filings which include contractual provisions that the Commission has found not to be in the public interest. See 18 C.F.R. § 154.93

(1974); *FPC v. Texaco Inc.*, 1964, 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112.

■ The Commission may also impose moratoria on filings for price increases in the interest of rate stability. *Permian Basin Area Rate Cases*, 1968, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312. Where there is a valid moratorium, the Commission may summarily reject proposed increases. *Mobil Oil Corp. v. FPC*, 1972, 152 U.S.App.D.C. 119, 469 F.2d 130. Where moratoria have been imposed in area rate proceedings, the Commission has also provided for special relief in individual cases based on appropriate factors. *Mobil Oil Corp. v. FPC*, 1974, 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72; *In re Other Southwest Area Rate Case*, 5 Cir., 1973, 484 F.2d 469, 483; *Southern Louisiana Area Rate Cases*, 5 Cir., 1970, 428 F.2d 407, 430–31. The special relief granted to Mitchell is of this type and appears to be the first such case subjected to appellate scrutiny as to its reasonableness. *MacDonald v. FPC*, D.C.Cir., *supra*.

■ The interpretation of Mitchell's settlement agreement is, therefore, somewhat unique in that it involves such special relief granted to Mitchell on the basis of non-cost factors. Thus, the meaning of the contractual terms, controlling price, and any escalation of that price in future years must be considered in the context of that relief. The court cannot add terms but must interpret the terms of the agreement of the parties as they must have understood them at the time they entered into it within the framework of the Natural Gas Act.

Our approval of the area rates in the *Other Southwest Area Rate Proceeding* was expressly conditioned on the availability of special relief where such relief was warranted by either cost or non-cost factors. *Other Southwest Area Rate Case*, *supra*, 469 F.2d at 483–84; *cf. Placid Oil Co. v. FPC*, 5 Cir., 1973, 483 F.2d 880, 909, *aff'd sub nom. Mobil Oil Co. v. FPC*, 1974, 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72. It was left to the Commission to determine the proper situations in which special relief might be

appropriate. As stated, the settlement provisions discussed, *supra*, were approved for such special relief. (This finding, is, of course, the subject of the remand in *MacDonald v. FPC*, D.C.Cir., *supra*.)

■ The reasonableness of the Commission's approval of this settlement and the reasonableness of the above ceiling rate of 30.25 cents are not before this court. These are matters for resolution by the Commission and the District of Columbia Circuit. The question that is before us is whether Mitchell agreed in its contract as approved in the context of its special relief application not to seek any additional increases in its rate for new gas for some period of time after the settlement was approved by the Commission. We find that Mitchell did agree not to seek any increases in its rates until December 28, 1977. This finding is based on an interpretation of the express terms of the contract as agreed to by the parties in 1972, supported by the terms of Opinion No. 649, and by the relationship of the special relief to the area rate structure.

*The contract terms*

Three express provisions in the contract regarding price escalations clearly contemplate no change in price until 1977. First, there was to be an automatic periodic escalation of one cent per Mcf to be added to the base rate at the beginning of each five year period during which the contract remained effective, commencing on December 28, 1977. Second, there was an express provision for a redetermination of the contractual base rate at the end of each five year period of the contract while it remained effective, also beginning in 1977.[9] Third,

the contract provided for arbitration of the base rate should the parties fail to agree on such a redetermination.[10] *Cf. United Gas Pipeline Co. v. Memphis Light, Gas & Water Division*, 1958, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153.

In addition, in the Settlement Proposal the *quid pro quo* of the exploration commitment is expressly based on the 30 cents per Mcf rate with the exploration commitment itself to be accomplished within the five year period ending in 1977. Moreover, the agreement by Mitchell to waive the benefit of the Btu adjustment clause in its contract during the period ending in 1977 underscores the planned price stability of the initial five year period. This is similar to the Commission's effort to establish in-line price stability for temporary certificate holders by barring the use of Btu adjustment clauses until permanent certification. *See Sohio Petroleum Co. v. FPC*, 10 Cir., 1961, 298 F.2d 465; *J. M. Huber Corp. v. FPC*, 3 Cir., 1961, 294 F.2d 568; *Pure Oil Co. v. FPC*, 7 Cir., 1961, 292 F.2d 350.[11]

*The Commission Opinion (No. 649, approving the settlement)*

The Commission opinion supports our interpretation of the contract, although the opinion does not directly consider future escalation of the base rate. There is no mention of the contractual provisions discussed above, but the Commission's approval is expressly based on amounts computed for revenues on the estimated additional gas from the wells to be drilled during the period 1973–1977 and on the additional revenues projected (from the above ceiling rate) for existing wells during the period 1973–1977. The Commission's approval of the settlement

9. Revised Gas Purchase Agreement dated July 12, 1954, Art. IX, Part B, § 4(b). Indeed, the 1972 Settlement Proposal was itself based on this provision for periodic redetermination of the base rate. *See* letter from Mitchell Energy & Development Corp. to Natural Gas Pipeline Corp. dated January 3, 1972.

10. Revised Gas Purchase Agreement dated July 12, 1954, Art. IX, Part B, § 4(c).

11. Although the Third, Seventh and Tenth Circuits all held that the Commission could not prohibit such clauses but only impose potential refund liability pending a determination of reasonableness, the Supreme Court upheld the Commission's conditional grants of temporary certificates prohibiting *any* price increases until permanent certification. *FPC v. Hunt*, 1964, 376 U.S. 515, 84 S.Ct. 861, 11 L.Ed.2d 878.

was clearly based on the terms of the contract and the settlement regarding price escalation discussed above. There was no need to impose an express moratorium because the terms of the contract itself proscribed base rate increases until 1977. *Cf. Mobil Corp. v. FPC*, 1972, 152 U.S.App.D.C. 119, 469 F.2d 130, 139.

*The special relief and the area rate structure*

Finally, the relationship of Mitchell's special relief to the original area rate structure also supports our interpretation of the contract. The above-ceiling settlement rate was a waiver of the limits of the area rate structure. The relief accorded Mitchell was thus inextricably related to that structure, because Mitchell was thereby insulated from the strictures of the moratorium within that rate structure. As a logical consequence, Mitchell was not affected by subsequent modification of the area rate structure. Mitchell, therefore, remained bound by the terms of its own agreement, which, as discussed above, provided for renegotiation of the base rate only in 1977.

Mitchell's position is analogous to that of the producers in the National Rate Case who are required to give up the benefit of the allowed use of refund obligations for interstate exploration in order to obtain the benefit of the National Rate Case. See Opinion Nos. 699 and 699–H. Mitchell's alternatives prior to 1977 are to waive entirely its own special relief or to abide by the terms of its settlement and wait until 1977 to renegotiate the contractual price.

A question remains as to the effect of the 1974 amendment to the contract. The amendment is an effective modification of the contract between Mitchell and Natural but it must be construed in light of the relationship between the grant of special relief in 1972 and the Other Southwest Area rate structure, as set forth in 18 C.F.R. § 154.109a.

■■■ Special relief is granted only to the extent that it is authorized by the Commission; for courts to go beyond the limits of such relief is to displace the Commission in its function of determining what is just and reasonable and in the public interest. *See Permian Basin Area Rate Cases*, 1968, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312; *FPC v. Hope Natural Gas Co.*, 1944, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333. Thus, the 1974 amendment insofar as it pertained to interests covered by the 1972 special relief was ineffective to change the limits of that relief unless allowed by the terms of the relief itself. Mitchell's recourse was to seek further special relief, not to assert any contractual or statutory right to a rate increase at any time. Such an assertion conflicts with the terms of special relief as granted by the Commission and we therefore reject it.

In short, we find that Mitchell is bound by the terms of the contract and the settlement to which it agreed in 1972, as approved by the Commission. No escalation of the rate under the contract is permitted or contemplated until 1977. The Commission properly rejected the proposed rate increase. The Commission's original decision to allow Mitchell special relief from the area rate structure was clearly based on the limited boundaries of the relief sought by Mitchell. We decline to expand those boundaries after the fact and therefore affirm the Commission's rejection of the proposed rate increase.

Affirmed.