ECEE, INC., et al., Petitioners,

v.

FEDERAL POWER COMMISSION,
Respondent.

No. 75–2327.

United States Court of Appeals,
Fifth Circuit.

Feb. 17, 1976.

Neal Powers, Jr., Roger T. Baker, Houston, Tex., for petitioners.

Drexel D. Journey, Gen. Counsel, Allan Abbot Tuttle, Sol., John H. Burnes, Fed. Power Commission, Washington, D. C., for respondent.

Before THORNBERRY, COLEMAN and MORGAN, Circuit Judges.

COLEMAN, Circuit Judge.

The petitioning natural gas producers seek review of Federal Power Commission denial of their motions to withdraw their applications for certificates of public convenience and necessity previously filed under § 2.75 of the Commission's General Policy and Interpretations,[1] and to substitute in lieu thereof new applications at the nationwide rate under § 2.56.[2]

The Commission order issuing the certificates under § 2.75 was, we find, final.

---

1. 18 C.F.R. § 2.75. Optional Procedure for Certificating New Producer Sales of Natural Gas. FPC Order No. 455, issued August 3, 1972, established § 2.75 to permit sales of natural gas from wells commenced on or after April 6, 1972, at a "just and reasonable" rate which "may be in excess of an area ceiling rate established in a prior opinion or order. . . ." The procedure, save one portion which is inapposite here, was sustained in *Moss v. FPC*, 1974, 164 U.S.App.D.C. 1, 502 F.2d 461. Certiorari was granted as to the issue with which we are not now concerned.

2. 18 C.F.R. § 2.56. FPC Opinion No. 699, issued June 21, 1974, amended § 2.56 to make the initial uniform national rate of 42 cents per Mcf applicable to interstate sales from wells commenced on or after January 1, 1973, and sales made pursuant to contracts executed on or after January 1, 1973, for gas not previously sold in interstate commerce. The new national rate structure which replaced area rates was affirmed in National Rate Cases for New Gas (*Shell Oil Co. v. FPC*), 5 Cir. 1975, 520 F.2d 1061.

The opinion precluding employment of the national rate structure was neither arbitrary nor unjust, nor an abuse of discretion. Having chosen the higher optional rate in preference to the then existing area rate, Petitioners are bound by their choice.

The orders of the Commission are affirmed.

### Facts of the Case

The events leading to the petition for review were as follows:

(1) December 26, 1972. Petitioners filed applications for certificates of public convenience and necessity permitting them to sell natural gas in interstate commerce. Section 2.75 was invoked to permit sales to Sea Robin Pipeline Company from offshore Louisiana at 35.0 cents per Mcf for a period of 20 years with price escalations of 2.5 cents per Mcf every 36 months after the date of initial delivery.

Once an application under the optional procedure was made, deliveries could commence prior to a Commission decision on the application, but for the first six months the rate could be no higher than the prevailing area rate. If the Commission had not made a decision within that time, the rate could be raised to the contract price until the Commission entered a final order, without being subject to refund. Section 2.75(n) permitted termination of deliveries so commenced

(1) if such contract for any reason shall terminate or be terminated prior to the issuance by the Commission of a final order upon review of such application, or (2) upon the issuance of a certificate containing conditions unacceptable to the party adversely affected.

(2) February 21, 1973. Pursuant to these procedures deliveries commenced at the area rate of 26 cents per Mcf.

(3) August 10, 1973. Following a hearing on the applications, the Administrative Law Judge entered an initial decision authorizing the issuance of the certificates in the form sought. In evaluating the costs and rate of return, the ALJ relied upon the Commission's preference for employment of the concept of national industry costs, rather than those of the individual company, as established in FPC Opinion 659, Belco Petroleum Corp., issued May 30, 1973. Based upon estimated 1971 costs for finding and producing gas and applying what it believed to be a reasonable 15 percent return, *Belco* found 45 cents per Mcf to be a just and reasonable rate for offshore Louisiana gas. Noting that the 35 cent figure in the instant contracts was the lowest cost supply source available to Sea Robin and was more than 25 percent below what the FPC considered reasonable for the same area, the ALJ saw no reason for objecting to the requested rate.

(4) August 21, 1973. Six months after the deliveries had commenced and no final order having been issued by the Commission, Petitioners began collecting the contract rate of 35 cents per Mcf.

(5) September 14, 1973. The FPC entered an order affirming and adopting the decision of the ALJ and issued the certificates.

(6) November 8, 1973. The Commission denied rehearing applied for by the American Public Gas Association (APGA).

(7) January 4, 1974. APGA filed a petition for review in the Court of Appeals.

(8) June 21, 1974. The Commission adopted a national rate structure aimed at replacing area proceedings. The national rate was set at 42.0 cents per Mcf. Opinion No. 699.[3]

(9) November 12, 1974. The producers, relying on a contractual provision authorizing cancellation of the contract prior to issuance of a final order by the Commission, terminated the 1972 agreement with Sea Robin and entered a new

**3.** The national rate was increased to 50.0 cents per Mcf on December 4, 1974, by FPC Opinion No. 699–H.

contract at the national rate level. The termination was not to be effective and deliveries were to continue under the 1972 contract until the FPC issued a certificate covering the 1974 agreement. Petitioners maintained that this was permissible since the Commission's 1973 order issuing the certificates was not "final" because APGA had a petition pending for review.

(10) November 27, 1974. Fifteen months after they had been collecting the higher contract rate and fourteen months after certification, Petitioners filed motions to withdraw from their certificates and submitted new applications for sales at the national rate level. The producers requested, however, that the withdrawal be contingent upon the issuance of certificates at the higher level.

(11) January 31, 1975. The Commission denied the motions to withdraw and dismissed the applications for certificates at the national rate. The FPC, noting the Natural Gas Act provision that a petition for review does not stay the effect of an order unless "specifically ordered by the court", 15 U.S.C. § 717r(c), determined that the petition for review did not affect the finality of its order. It also observed that the sought after judicial review had not affected the deliveries or collection of the contract rate.

Further, Opinion No. 699–I, adopted January 7, 1975, was held to be dispositive in denying the national rate to Petitioners. The decision, in setting eligibility standards, provides:

> Where the average price and escalations provided for in the contract filed pursuant to the optional procedure are equal to or greater than the average price determined pursuant to the national rate regulations without regard for any price increases which might result from the biennial review of the national rate pursuant to Section 2.56(n), the Commission will determine whether to allow the just and reasona-

ble rate under the national rate structure, *provided no certificate for the subject sale has been issued pursuant to Section 2.75.* (Emphasis added.)

Thus, issuance of the certificates made the producers ineligible for the rate. Moreover, even if the certificates had not been issued, the fact that the average contract price and escalations were lower than the average national price disqualified Petitioners.[4]

(12) February 28, 1975. A rehearing was sought, raising the additional claim that denial of the opportunity to collect the nationwide rate was unfair and inequitable.

Petitioners maintained that they chose the optional procedure in preference to area rates prior to adoption of national rate procedure, and should be allowed to choose the latter. In denying the rehearing, the Commission responded that for two years Petitioners had had the advantage of selling gas at a price some 35 percent above the area ceiling. The FPC saw nothing inequitable in not permitting a switch just because the area ceiling had been effectively increased by the national rate; although Petitioners might find the higher figure attractive, there would be no corresponding benefit to the public to offset the increased prices.

(13) July 27, 1975. APGA voluntarily dismissed its petition for review.

(14) May 22, 1975. The producers filed this petition for review.

### *Finality of the Order*

◼ Final orders are not limited to the last order in a proceeding, but *to be final* an order must "impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process". *Chicago & Southern Airlines v. Waterman Steamship Corp.*, 333 U.S. 103, 113, 68 S.Ct. 431, 437, 92 L.Ed. 568 (1948). *See also Columbia Broadcasting System v. United*

---

4. Contract average of 42.125 cents at 15.025 psia as opposed to the national average of 60.69 cents at 15.025 psia.

*States,* 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942); *Bethesda-Chevy Chase Broadcasters Inc. v. FCC,* 1967, 128 U.S.App.D.C. 185, 385 F.2d 967, 968.

■ The order of the Commission adopting the findings of the Administrative Law Judge and issuing the certificates finally sanctioned and established the legal relationships among the Petitioners, Sea Robin, and the FPC. The order would not have been reviewable by the Court of Appeals under the terms of the Natural Gas Act had it not done so. 15 U.S.C. § 717r(b). The fact that the decision was ripe for judicial review was the "touchstone of finality". *Blanco Oil Co. v. FPC,* 1973, 158 U.S.App.D.C. 257, 485 F.2d 1036, 1038.

■ A *complete* resolution of matters before an administrative or judicial tribunal does not wait for finality until an appeal is decided; it is final *unless and until* it is stayed, modified, or reversed. This basic concept is further bolstered by the unequivocal language of § 717r(c) of the Natural Gas Act that "the commencement of proceedings [for review] . . . shall not, unless specifically ordered by the court, operate as a stay of the Commission's order". In the absence of a stay, the FPC's orders are entitled to have administrative operation and effect during the disposition of the proceedings. *Jupiter Corp. v. FPC,* 1969, 137 U.S.App.D.C. 295, 424 F.2d 783, 791.

We must interpret the word "final" as the parties must have understood it at the time they entered into the agreement *within the framework of the Natural Gas Act. Mitchell Energy Corp. v. FPC,* 5 Cir. 1975, 519 F.2d 36, 41; *Texas Eastern Transmission Corp. v. FPC,* 5 Cir. 1962, 306 F.2d 345, 347. The previously noted provisions of the Act all lead to the inescapable conclusion that Congress intended and the parties must have understood the Commission's action to be its final disposition of the matter.

If there was ever any doubt, the FPC's interpretation and policies, to which we may resort,[5] are even clearer. For example, § 2.75 itself provides in part:

1. A final order of this Commission issuing a certificate as applied for, or issuing a conditioned certificate acceptable to the applicants, shall constitute a final determination that the rates, charges and services are just, reasonable and required by the present and future public convenience and necessity.

n. . . . . If the Commission by final order shall deny such application, or if the party or parties to the contract adversely affected shall not accept the terms and conditions prescribed . . ., deliveries thereunder shall be terminated . . .

o. . . . . [D]eliveries will be made at rates no higher than the prevailing area ceiling rate and shall so continue for six months unless the Commission has made its final orders . . .; at the end of such six-month period (if the Commission has not made its final order), the seller . . shall be entitled to receive . . . the rates specified in the contract, and such contract rates shall continue . . . until the Commission enters its final order on the certificate application.

Petitioners further claim that they had not yet accepted the certificates because the Court, upon hearing APGA's allegations, might have ordered the Commission to refuse certification of the sales or to attach conditions unacceptable to the contracting parties. Had this occurred the sales would have terminated. *See Public Serv. Comm'n of State of N.Y. v. FPC,* 1972, 149 U.S.App.D.C. 421, 463 F.2d 824, 829–30; 18 C.F.R. § 2.75(n). Therein lay Petitioners' remedy if the appellate disposition of the case was contrary to the Commission's final order.

---

5. *Hodgson v. Mauldin,* N.D.Ala.1972, 344 F.Supp. 302, 307, *aff'd,* 5 Cir. 1973, 478 F.2d 702.

■ It is obvious to us that the certificates were "accepted" when they were issued, without condition or modification, *exactly as the parties requested.* The producers sought no rehearing or alteration; rather, they proceeded for the next fourteen months to sell gas above the area rate *under the authority* of the certificates which they now seek to attack.

### Effect of Finality

■ Since the issuance of the certificates was final in September, 1973, the contractual provision permitting termination prior to that event was inoperative when termination was attempted in November, 1974. The original contract as entered into in 1972 stands. Thus, Petitioners were not entitled to the national rate as originally promulgated, and certainly not as it was construed by later opinions. The FPC's original Opinion 699, June 21, 1974, made the nationwide rate applicable to interstate sales from wells commenced on or after January 1, 1973, and to sales made pursuant to contracts executed on or after January 1, 1973, for gas not previously sold in interstate commerce. Petitioners' contract was entered into in 1972.

Subsequent Opinion 699–I, January 7, 1975, (quoted in the factual recitation) is even more direct. When a certificate has been issued pursuant to § 2.75, the national rate is not available.

### Equity of the Restriction

Petitioners claim that binding them to the certificates as issued is unfair because they never had the opportunity to choose the national rate structure. This argument begs the question. The producers sought and received a price for their gas under the optional procedure some 35 percent above the area rate they would otherwise have been required to accept. They collected the higher rate for almost a year before the nationwide schedule was promulgated.

Obviously there are differences between the national structure and the area procedure other than a quantum in-crease in price, but price is the real issue in this case. In that regard, the nationwide structure amounts really to abandoning area boundaries and increasing the rates. We must recognize our statement in *Mitchell Energy Corp. v. FPC,* 5 Cir. 1975, 519 F.2d 36, 43, that

[t]he above-ceiling settlement rate was a waiver of the limits of the area rate structure. The relief accorded Mitchell was thus inextricably related to that structure, because Mitchell was thereby insulated from the strictures of the moratorium within that rate structure. As a logical consequence, Mitchell was not affected by subsequent modification of the area rate structure. Mitchell, therefore, remained bound by the terms of its own agreement . . . ..

■ A producer may benefit by one procedure, or the other, *but not both. Cf. Moss v. FPC,* 1974, 164 U.S.App.D.C. 1, 502 F.2d 461, 470.

■ In determining whether or not to grant a certificate, benefit to the producer is certainly not the FPC's only consideration. Public interest is always involved and "the Commission, as its guardian, must determine in every proceeding whether the certificate applied for is in the public interest or whether that interest calls for some other disposition". *Panhandle Eastern Pipe Line Co. v. FPC,* 3 Cir. 1967, 386 F.2d 607, 610. What public interest will be satisfied by permitting Petitioners to raise the price of flowing gas?

The stated purpose of the higher national rates for new gas was to encourage larger interstate sales and promote further exploration. Petitioners did not appear before the Commission when it held hearings to set the cutoff date; nor have they advanced any cogent arguments as to how ultimate consumers will be benefited in paying higher prices for developed gas supplies already committed to interstate commerce.

■ Petitioners set the 35 cent rate themselves. They sought its approval from the Commission. They obtained

that approval, in final form. They operated under it for two years. A higher price becoming available, the Petitioners wish to erase all that had gone on before. For all the reasons hereinabove set forth, the Commission was within its authority, properly exercised, when it denied the erasure.

Affirmed.