**FREEPORT OIL COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 78–2852.

United States Court of Appeals, Fifth Circuit.

Aug. 18, 1980.

Butler, Binion, Rice, Cook & Knapp, Neal Powers, Jr., Byron A. Thomas, Houston, Tex., for petitioner.

John B. Rudolph, Washington, D.C., Neal Powers, Jr., Houston, Tex., for Freeport Minerals Co.

Joshua Z. Rokach, F.E.R.C., Washington, D.C., for intervenor.

J. David Mann, Jr., Washington, D.C., for Laclede Gas Co.

Before COLEMAN, Chief Judge, BROWN and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

The Federal Energy Regulatory Commission (FERC or Commission)[1] regulates interstate sales of natural gas. FERC granted Freeport Oil Company (Freeport), a producer of natural gas, short-term authority to make interstate sales of its gas at a price in excess of the prevailing regulated rate. Subsequently, FERC increased the regulated rate above Freeport's short-term rate, and Freeport adjusted its own rate to bring it into conformity with the new regulated rate. FERC ruled that Freeport's rate increase was unlawful and ordered Freeport to refund all sales proceeds attributable to the rate increase.

Freeport now petitions for review of the Commission's order. Because we find that FERC based its order on a misinterpretation of its own regulations and of the terms of the certificate granting Freeport short-term authority to sell gas interstate, we vacate the Commission's order.

## I

### A. Background

To understand the facts of this case and the issues presented, it is necessary to be aware of the statutory and regulatory schemes that formed the background of FERC's order.

The Commission regulates the sale and transportation of gas in interstate commerce in accordance with the provisions of the Natural Gas Act, 15 U.S.C. §§ 717–717w (1976), and FERC rules and regulations. The Natural Gas Act provides a three-phase

---

1. The Federal Energy Regulatory Commission took over the functions and responsibilities of the Federal Power Commission on October 1, 1977, pursuant to the Department of Energy Organization Act, Pub. L. 95–91, 91 Stat. 565 (Aug. 4, 1977) and Exec. Order No. 12009, 42 Fed.Reg. 46267 (Sept. 15, 1977). All references to the "Commission" or "FERC" refer to either the Federal Energy Regulatory Commission or the Federal Power Commission, whichever is applicable.

regulatory scheme.[2] First, the Act governs the entry of gas into the interstate market. Before gas can be sold in the interstate market, whether from the wellhead or intrastate markets, the seller must obtain from FERC a certificate of public convenience and necessity.[3] Once the certificate is issued and accepted by the seller, the gas is dedicated to the interstate market, and it cannot be withdrawn from that market without FERC approval.[4] Second, the Act controls the price at which interstate gas can be sold.[5] All rates charged for gas must be "just and reasonable." Third, the Act provides that any change in a contract price for gas must be approved by FERC. No change in price, or in any of the terms of the certificated contract, may be effected unless the seller gives 30 days notice to FERC and to the public.[6] During that 30-

2. Interstate sales of gas are made pursuant to private contracts negotiated by individual parties. Under the Natural Gas Act, 15 U.S.C. §§ 717 717w (1976), FERC has the power to prevent an interstate sale if the terms of the contract contravene the policies of the Act or the Commission's rules and regulations. *See United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956).

3. Sections 7(c) and (e), 15 U.S.C. §§ 717f(c), (e). Sections 7(c) and (e) state, in part:

   (c) Certificate of public convenience and necessity

   No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations . . . ..

   (e) Granting of certificate of public convenience and necessity

   [A] certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.

4. Section 7(b), 15 U.S.C. § 717f(b).

5. Sections 4 and 5, 15 U.S.C. §§ 717c(a), 717d(a). Section 4(a) states:

   (a) Just and reasonable rates and charges

   All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful.

   Section 5(a) states:

   Fixing rates and charges; determination of cost of production or transportation

   (a) Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: *Provided, however,* That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates.

6. Section 4, 15 U.S.C. § 717c. Those subsections of section 4 applicable to rate increases state:

   (d) Changes in rates and charges; notice to Commission

day period, FERC may suspend the proposed rate increase for up to five months in order to determine whether the new rate is just and reasonable. If, after the expiration of five months, the Commission has not made a determination, the proposed rate increase becomes effective automatically, but the Commission still retains the power to disallow the increase in the event it finds the new rate not to be just and reasonable. If that is the eventual determination, the seller is required to refund to its buyers revenues it has collected as a result of the new rates.

When the Commission began its regulatory function in 1938, it restricted its jurisdiction to the relatively few natural gas pipeline companies. The Commission was thus able to regulate the sale of gas on a company-by-company basis and to set the just and reasonable rate for each sale. The

rate was, uniformly, based on the selling company's costs of service. In 1954, however, the Supreme Court extended the Commission's jurisdiction to include the power to regulate the sale of gas, by producers, at the wellhead. *Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954).[7] Because of the vast number of independent producers, the company-by-company, rate-setting procedure quickly became unworkable. The massive volume of applications for certificates of public convenience and necessity and filings for rate increases made it virtually impossible for the Commission to determine the just and reasonable rate on a case basis, and, consequently, it tended to approve almost any rate the producer, or pipeline company, requested. The Supreme Court curtailed this practice in section 7 certification proceedings in *Atlantic Refining Co. v.*

Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. . . .

(e) Authority of Commission to hold hearings concerning new schedule of rates

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, State Commission, or gas distributing company, or upon its own initiative without complaint, at once, and if it so orders, without answer or formal pleading by the natural-gas company, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the natural-gas company affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be

proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of the suspension period, on motion of the natural-gas company making the filing, the proposed change of rate, charge, classification, or service shall go into effect. Where increased rates or charges are thus made effective, the Commission may, by order, require the natural-gas company to furnish a bond, to be approved by the Commission, to refund any amounts ordered by the Commission, to keep accurate accounts in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts were paid, and, upon completion of the hearing and decision, to order such natural-gas company to refund, with interest, the portion of such increased rates or charges by its decision found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the natural-gas company, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

7. The Natural Gas Act regulates "natural gas companies." The Supreme Court defined the term to include natural gas producers. This appeal concerns only a natural gas producer. As a result, the remainder of the opinion will refer to regulations and regulatory concepts only as they relate to producers.

*Public Service Commission of New York,* 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959). There, it directed the Commission not to issue a certificate of public convenience and necessity if it found the contract price to be not in the public interest—that is, excessive—and suggested that FERC certify only those sales where the price is "in line" with the prevailing certified prices.

The Commission responded to the Supreme Court's mandate by issuing Statement of General Policy No. 61–1, 24 F.P.C. 818 (Sept. 28, 1960). In that statement, the Commission announced an "in-line" pricing structure to govern the issuance of certificates of public convenience and necessity. "In-line" rates were listed for designated geographic areas,[8] and no rate higher than the prevailing, or "in-line," rate for sales from a designated area would be approved. As the Supreme Court observed in *United Gas Improvement Co. v. Callery Properties, Inc.,* 382 U.S. 223, 227, 86 S.Ct. 360, 363, 15 L.Ed.2d 284 (1965),

> The fixing of an initial "in-line" price establishes a firm price at which a producer may operate, pending determination of a just and reasonable rate, without any contingent obligation to make refunds should a just and reasonable rate turn out to be lower than the "in-line" price. Consumer protection is afforded by keeping the "in-line" price at the level where substantial amounts of gas have been certificated to enter the market
>
> . . . .

The Commission's statement also announced a "guideline" policy under which presumptively just and reasonable rates, set out in the statement for each of the designated geographic areas, would govern section 4 filings for rate increases under previously certificated contracts. These guideline rates were generally lower than the "in-line" rates applicable in new certification proceedings because they applied to "old" gas. If a producer sought a section 4 price increase in excess of the "guideline" rate, the Commission would immediately suspend the rate increase and would not approve the proposed increase unless it found the increase to be just and reasonable.[9] The "in-line" and "guideline" rate schedules published in the statement were not considered by the Commission to have been established, as just and reasonable, under section 5 of the Act, but only to provide interim standards pending the completion of the Commission's area rate proceedings that had been launched under that section. The Commission concluded its statement by announcing that the section 5 area rate proceedings would provide the long term solution to just and reasonable rate determinations.

The first area rate proceeding, covering the Permian Basin, was completed in 1965. Permian Basin Area Rate Proceeding, 34 FPC 159 (1965). For gas produced or transported in the Permian Basin, the new area rates replaced the in-line rates and the guideline rates that theretofore governed section 7 certifications and section 4 filings. The Permian Basin rates were computed by multiplying an average production-cost factor by an average rate of return for the area. The Commission also established a two-tier pricing structure: new gas, under contract after January 1, 1961, was certificated at a price higher than the price that applied to applications for rate increases under pre-January 1, 1961, contracts. The higher price for new gas was designed to stimulate exploration and production. The Supreme Court approved the area rate proceeding device for establishing just and reasonable gas prices in *In re Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct.

---

8. These designated areas included eleven numbered districts in Texas; Southern Louisiana; Northern Louisiana; Mississippi; three areas (Panhandle, Other, and Carter-Knox) in Oklahoma; Kansas; two areas (Permian Basin and San Juan Basin) in New Mexico; Colorado; Wyoming; and West Virginia.

9. Of course, if the Commission did not make its just and reasonable determination within five months of the rate suspension, the proposed rate would automatically take effect, thus subjecting the producer to a refund obligation in the event the Commission ultimately disallowed the increase.

1344, 20 L.Ed.2d 312 (1968), and the Permian Basin proceeding became the model for price regulation under the Natural Gas Act.

By the late 1960s, it became evident that the area rate proceeding device was an inadequate method of implementing the national gas policy. Area rate proceedings were, characteristically, protracted, and, as a result, the Commission often failed to consider the most current rate-base costs. Consequently, the rates it established proved to be too low to attract gas to the interstate market; instead, the gas was sold in intrastate markets where the price, unregulated, was much higher.

In those parts of the country where area rates had not been established and the interim "in-line" rates still controlled the price of gas under section 7 certifications, producers were reluctant to dedicate gas to interstate commerce because of the possibility that the Commission might subsequently promulgate a lower area rate.[10] The result was a severe gas shortage. *See Southern Louisiana Area Rate Cases (Austral Oil Co.) v. FPC*, 428 F.2d 407, 434–40 (5th Cir.), *cert. denied sub nom., Municipal Distributor Group v. FPC*, 400 U.S. 956, 91 S.Ct. 241, 243–44, 27 L.Ed.2d 257 (1970).

In *Southern Louisiana Area Rate Cases (Austral Oil Co.) v. FPC*, in which we reviewed the Southern Louisiana Area Rate Proceedings, the suppliers of gas took sharp issue with the criteria the Commission took into account in establishing the area rates. Though we found that the Commission had not acted unlawfully in choosing the factors that made up the rate base and, therefore, affirmed, we suggested that, in view of the rapidly deteriorating supply of gas, the Commission could, and should, consider noncost factors, such as the effect of its rates on the supply of gas in the interstate market. The Commission responded by reopening its Southern Louisiana Area Rate Proceedings to consider evidence bearing on the supply and demand of gas and, then, resetting the area rates at higher levels to encourage further exploration and production and the dedication of more gas to the interstate market. Opinion No. 598, 46 F.P.C. 86 (July 16, 1971), *modified on rehearing*, Opinion No. 598–A, 46 F.P.C. 633 (Sept. 9, 1971), *affirmed sub nom., Placid Oil Co. v. FPC*, 483 F.2d 880 (5th Cir. 1973), *affirmed sub nom., Mobile Oil Corp. v. FPC*, 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974).

Once area rates were set, they provided the benchmarks for the Commission's acceptance or rejection of section 7 applications for certificates of public convenience and necessity. The Commission so steadfastly adhered to these rates that it refused to consider undisputed evidence of increased production costs that occurred subsequent to the previous area rate proceedings, or market analyses that may have indicated a need to move the rates upward. *See Phillips Petroleum Co. v. FPC*, 405 F.2d 6 (10th Cir. 1969).[11]

By early 1970, the Commission finally concluded that its rigid policy of issuing section 7 certificates only in cases where the seller agreed to use the area rate could not secure adequate supplies of new gas for the interstate market. The interstate gas market was so short of supply, with extensive curtailments in natural gas deliveries, that the Commission considered the situation to be an emergency. Several new measures were therefore undertaken to obtain the immediate delivery of gas.

---

**10.** The determination under section 5, 15 U.S.C. § 717d (1976), of area rates for every producing area took over twelve years to complete. In the meantime, new certificates were being granted based on in-line prices. If the area rates turned out to be lower than the in-line rates, section 5 authorized the reduction of the higher rates. The producer, nevertheless, had to dedicate the gas permanently to the interstate market. *See* Docket No. R–411, Order No. 455, 37 Fed.Reg. 16189 (1972).

**11.** In *In re Permian Basin Area Rates Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968), the Supreme Court noted the Commission's policy of granting exceptions to area rates only in the most extreme circumstances, but observed that the Commission had the discretion under section 7 to use only area rates in certification proceedings.

On July 17, 1970, the Commission issued a Statement on New Applications for Certificates for Sales from All Areas, Docket No. R–389A, 35 Fed.Reg. 11638 (1970). In paragraph 12 of that statement, the Commission gave notice that it would "accept for consideration applications by independent producers requesting issuance of a certificate of public convenience and necessity for sales of natural gas notwithstanding that the stated rate may be in excess of the [area] or [in-line] rates." *Id.* at 11639. Any rate granted by the Commission under that policy statement was subject to prospective upward or downward modification should a rate proceeding that covered the producer's area subsequently establish a different rate. *Id.* at 11638. The possibility that a future area rate would not reach the certificated rate, thus causing the producer to suffer a rate decrease, discouraged most producers from utilizing paragraph 12 of the statement to make permanent section 7 dedications of gas. Order No. 455, 48 F.P.C. 218 (Aug. 3, 1972), 37 Fed.Reg. 16189, 16192 (Aug. 11, 1972).

On April 15, 1971, the Commission adopted Rule 2.70 to meet the emergency it anticipated would occur during the 1971–72 winter heating season, when the demand for natural gas would far exceed supply. Measures for the Protection of Reliable and Adequate Natural Gas Service, Order 431, 45 F.P.C. 570 (1971) (as modified, 18 C.F.R. § 2.70 (1979)). The Commission, in rule 2.70, instructed producers that it would approve prices in excess of the area or "in-line" rates in accordance with paragraph 12 of the July 17, 1970, statement, and that it would "consider limited term certificates with pregranted abandonment." Rule 2.70(b)(3). In implementing rule 2.70, the Commission approved a rate if it (1) was in-line with recent intrastate pricing in the producer's immediate geographic area and (2) was no higher than necessary to draw the gas from the intrastate to the interstate market. *See, e. g., Nueces Industrial Gas Co.*, 45 F.P.C. 1224, 1227 (June 30, 1971). The rule did not alter the Commission's policy, under paragraph 12, of modifying the producer's rate in the event the Com-

mission subsequently promulgated a different area rate. Because the term of a rule 2.70 certificate would likely expire before, or shortly after, a new area rate could be promulgated, however, a producer's risk of prospective revenue loss if he opted to proceed under rule 2.70 was slight.

Despite the implementation of rule 2.70, the shortage of natural gas in the interstate market persisted. The Commission therefore took another step to alleviate the problem, adopting rule 2.75, Optional Procedure for Certificating New Producer Sales of Natural Gas, Order 455, 48 F.P.C. 218 (Aug. 3, 1972), 37 Fed.Reg. 16189 (Aug. 11, 1972). Unlike rule 2.70, which was designed to attract short term supplies of gas, rule 2.75 was intended "to stimulate the immediate introduction of new, long term (permanently dedicated) gas supplies into the interstate market . . . ." *Id.* at 16192. Like rule 2.70, rule 2.75 authorized the Commission to issue certificates of public convenience and necessity at prices in excess of area or "in-line" rates.

The features of the rule 2.75 optional procedure were described by the Supreme Court in *FPC v. Moss*, 424 U.S. 494, 497–98, 96 S.Ct. 1003, 1006, 47 L.Ed.2d 186 (1976).

First, it permits producers to tender for FPC approval contracts for the sale of new natural gas at rates that may exceed the maximum authorized by the applicable rate order. Second, the FPC will determine in a single proceeding whether the "public convenience and necessity" under § 7(c) of the Act, 15 U.S.C. § 717f(c), warrants the issuance of a certificate authorizing the sale and whether the rates called for by the contract are "just and reasonable" under § 4(a), 15 U.S.C. § 717c(a). Third, a permanent certificate issued by the Commission and accepted by the producer is not subject to change in later proceedings under § 4 of the Act, 15 U.S.C. § 717c, and the rates may be collected without risk of refund obligations. 48 F.P.C., at 226. See 18 CFR § 2.75(d) (1975). Fourth, Order No. 455 authorizes inclusion in the permanent certificate of . . . abandonment as-

surance—or "pregranted abandonment" . . . 18 CFR § 2.75(e) (1975). (Footnotes omitted.) The court cautioned that, although a rate established under rule 2.75 was not subject to increase in a section 4 proceeding, it could be decreased by a future Commission under section 5.

> The [rule 2.75] procedure does not . . limit the applicability of § 5, 15 U.S.C. § 717d. See 18 CFR § 2.75(d) (1975). The Commission noted in Order No. 455 that it was unable to "bind a future Commission not to invoke the prospective operation of Section 5"; the Commissioners further stated that "[t]o the extent that this Commission can grant certainty of rates, we do so." 48 F.P.C. 218, 223 (1972).

*Id.* at 498, n.4, 96 S.Ct. 1006, n.4.[12]

In summary, then, the granting of a certificate of public convenience and necessity under rule 2.75 amounted to a qualified guarantee to the producer that his price would not go down. Order No. 455-A, clarifying Order 455, 48 F.P.C. 477 (Sept. 8, 1972). In the same breath, the Commission gave the consumer an unqualified guarantee that his price would not go up. Section (m) of rule 2.75 provided,

> By acceptance of a certificate issued [under the optional procedure], the seller-applicant unconditionally agrees to (1) waive all rights to seek future rate increases under section 4 of the Natural Gas Act with respect to the contract submitted, other than price escalations, if any, as certified by the Commission.

On June 21, 1974, almost two years after the promulgation of rule 2.75, the Commission established a uniform national rate for "new" gas. The national rate replaced the area rates and those "in-line" rates still in existence. In the order, the Commission rescinded rule 2.70's authorization of limited-term certificates and paragraph 12, which, as we have pointed out, had authorized the certification of gas at rates above the area or "in-line" rates. Opinion No. 699, 51 F.P.C. 222 (June 21, 1974). On rehearing, however, the Commission reconsidered its decision to rescind the limited-term certificate procedure of rule 2.70 and, on September 9, 1974, reinstated the rule in a continuing effort to assist the pipelines, still facing extreme shortages of gas, in negotiating for additional supplies. Opinion No. 699-B, 52 F.P.C. 700, 39 Fed.Reg. 33205 (Sept. 19, 1974). Because the rescission of paragraph 12 was not before FERC on rehearing, it was necessary for FERC, in reinstating the rule 2.70 certificating procedure, to augment the rule to provide for the granting in limited-term certificates of rates above the new national rate. The Commission also stated the standards for determining whether the price requested in a rule 2.70 certificate application is consistent with the public convenience and necessity.

> The applicants will have the burden of demonstrating by substantial evidence that the price for which certification is sought is the lowest price at which that particular supply of gas may be obtained for the interstate market and that the supply of gas is available only for the limited period for which certification is sought. We realize that these are general guidelines and state that rates allowed in any given case will not constitute a determination that equivalent rates would be approved in another case.

39 Fed.Reg. at 33206.

**B.  Facts**

The facts in this case present an excellent example of why the rule 2.70 procedure described above was necessary to stimulate the dedication of gas to the interstate market. Mississippi River Transmission Corporation (MRT), a pipeline company, supplied gas to Laclede Gas Company (Laclede), a public utility engaged in the distribution of

---

**12.** The Court in *Moss* affirmed the Commission's authority to issue certificates with a pregranted abandonment clause. *FPC v. Moss,* 424 U.S. 494, 96 S.Ct. 1003, 47 L.Ed.2d 186 (1976). The rule 2.75 procedure was upheld in all other respects in *Moss v. FPC,* 502 F.2d 461 (D.C. Cir. 1974); *rev'd in part, FPC v. Moss,* 424 U.S. 494, 96 S.Ct. 1003, 47 L.Ed.2d 186 (1976).

natural gas at retail to domestic, commercial and industrial customers in St. Louis, Missouri, and neighboring counties. Laclede purchased all its gas from MRT and was MRT's largest single customer, accounting for about 60% of MRT's total sales. MRT, therefore, while not directly selling gas to retail customers, was a crucial part of the flow of natural gas from the wellhead to the individual homes and businesses in the St. Louis area.

MRT purchased 70% of its gas supplies from United Gas Pipeline Co. and 15% from Truckline Gas Co. During 1973, United lawfully decreased its deliveries to MRT by 22%. Truckline likewise decreased its deliveries to MRT in the same year, by 29%. Another of MRT's suppliers could not deliver gas to MRT during the heating season. Between 1970 and 1973, the total volume of gas purchased by MRT declined almost 18%. As a result, MRT's customers, and, eventually, the ultimate consumers, were unable to satisfy their natural gas needs during the critical winter months. As the Commission later concluded in granting the rule 2.70 certificate to Freeport Oil Company in this case, "[T]here is no question that MRT [was] faced with a critical problem which in turn [caused] its customers severe curtailments of natural gas." Limited-Term Certificate of Freeport Oil Co., Docket No. CI74–78, 52 F.P.C. 1141, 1143 (Oct. 31, 1974).

To help alleviate the shortfall of natural gas deliveries, both MRT and Laclede engaged in a drilling venture with Freeport, an oil and gas producer. Freeport, in a joint venture with a group of producers,

had earlier undertaken an exploratory effort to find natural gas in Texas.[13] Some wells were drilled but were unproductive, and the producers, except Freeport, were unwilling to invest in further exploration. Freeport eventually moved MRT and Laclede to help finance an additional test well. MRT and Laclede purchased a part interest in the venture from the other members of the original group and together with Freeport, who served as the operator, paid the drilling costs. Before the drilling commenced, MRT obtained an option, akin to a right of first refusal, to buy Freeport's share of any natural gas that might be discovered, at the highest price Freeport could obtain from any interstate purchaser. It was understood, however, that Freeport would not have to honor the option if a certificate of public convenience and necessity could not be obtained by November, 1974.

When the additional test well was successful, MRT exercised its option to purchase Freeport's share of the gas produced. On July 24, 1973, pursuant to the option, Freeport entered into a three-year contract to sell natural gas to MRT at a price of 56 cents per one thousand cubic feet (Mcf) with an annual escalation of one cent per Mcf. The area rate at the time the contract was signed was 42 cents per Mcf with one cent per Mcf annual escalation. Opinion No. 699, *supra*.[14] The contract contained an area rate clause that called for an increase in the gas price in the event the Commission established a higher area or national rate.[15]

13. The producers in the exploratory group were Chevron Oil Co., P. O. Wellman, Fluor Corp., Mecom Trust and Freeport.

14. On December 21, 1974, the area rate was changed, effective June 21, 1974, to 50 cents per Mcf with one cent per Mcf annual escalation. Opinion No. 699–H.

15. We set out below the entire area rate clause.
    SECTION 3. If the Federal Power Commission, or any successor governmental authority having jurisdiction in the premises, shall at any time hereafter prescribe, for the area in which Seller's properties are situated, a higher applicable just and reasonable area

ceiling rate for the gas of the quality involved herein than the price herein provided to be paid, then the applicable price to be paid by Buyer to Seller for gas delivered under the provisions of this agreement shall be increased, effective as of the date such higher ceiling rate is prescribed, to equal such higher ceiling rate; provided, however, that Buyer shall have the right, at its option, to intervene in any area rate proceeding held to give consideration to any area rate higher than those provided for herein, to oppose any such higher area rate, to seek relief therefrom in any regulatory agency or any court having

On August 6, 1973, Freeport filed an application pursuant to section 7 of the Natural Gas Act, and rule 2.70, for a limited-term certificate of public convenience and necessity with pregranted abandonment authority. The terms of the certificate for which Freeport applied were the same as the terms of the three-year contract between Freeport and MRT. Record at 212, 215. Thus, Freeport sought a base price of 56 cents per Mcf and "Fixed periodic and *area rate* (increases)." Record at 228 (emphasis added).

A formal hearing on the application was held before an administrative law judge on January 18, 1974, and, on March 14, 1974, he issued an initial decision. The judge first determined that MRT had a genuine gas supply emergency. The judge then found that the proposed price was necessary to attract the gas to the interstate market. The essential requirements of rule 2.70 having been satisfied, the judge concluded that the application should be granted and issued an initial decision doing so.

The application next went to the Commission on exceptions to the administrative law judge's initial decision. Before the Commission could consider the matter, however, the Commission, as we have pointed out, see p. 8521 *supra*, issued Opinion No. 699, rescinded the rule 2.70 procedure for issuing limited-term certificates and declared that no additional rule 2.70 limited-term certificates would be granted. Freeport's application, therefore, was perfunctorily denied. Three months later the Commission reinstated the rule 2.70 limited-term certificate procedure. Freeport immediately moved the Commission to reinstate its application, and the motion was granted. The Commission decided to limit its review of Freeport's application to the record previously established before the administrative law judge. In determining the appropriateness of the 56 cents per Mcf rate approved by the administrative law judge, the Commission used the standard applicable to rule 2.70 applications at the time the judge handed down his decision; that is, whether the applicant's requested price was (1) in line with prevailing intrastate prices and (2) no higher than necessary to attract the gas to the interstate market. The Commission found that this standard had been met and, further, that the contract rate proposed by Freeport was "just and reasonable." [16] Record at 79. These findings are not in question in this appeal. The rate was set forth in the Commission's Order Granting Motion for Reinstatement of Proceeding and Issuing Certificate for Limited-Term Sale of Natural Gas (issued Oct. 31, 1974):

> A certificate of public convenience and necessity is issued authorizing Freeport to sell natural gas in interstate commerce to MRT for a period of three years from the date of issuance of this order at the rate of 56¢ per Mcf . . . with an escalation of 1¢ per Mcf per year . . upon the terms and conditions of this order and specifically limited to such sales and facilities.

Record at 81. The limited-term certificate was granted by the Commission just one day before MRT's right to purchase Free-

---

jurisdiction, but such relief, if obtained, shall not result in a price which is less than the price otherwise applicable hereunder. Whenever the provisions of this Section 3 effectuate an increase in price, such increased price shall thereupon be substituted for and become the applicable contract price hereunder and shall thereafter be subject to the same future periodic increases in the contract price as provided in Section 1 of this article.
Record at 30–31.

**16.** The Commission first found that the sale was required by the public convenience and necessity, then stated that "[n]o additional finding is required by law. . . . ." Record at 79. Although rule 2.70 was not a section 5 rate making procedure, see p. 8527, note 17, *infra*, the Commission nevertheless found the 56¢ rate "just and reasonable." "[W]e find that the rate is the 'lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest' (*Atlantic Refining Co. v. Public Service Commission of New York*, 360 U.S. 378, 388 [79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312] (1958), and, therefore is just and reasonable." Record at 808. The factor considered by the Commission was MRT's critical supply problem and the necessity of attracting gas from the intrastate market.

port's share of the gas from the exploratory well would have terminated. Freeport accepted the certificate and began the gas shipments required by its contract with MRT.

On July 27, 1976, the Commission substantially increased the national rates applicable to Freeport's sales to MRT. Opinion No. 770 (July 27, 1976). The promulgation of these higher rates activated the area rate clause in Freeport's contract with MRT, and, on August 24, 1976, Freeport, pursuant to section 4 of the Natural Gas Act, filed a notice of rate increase to take advantage of the new national rates. The Commission did not suspend the increase; therefore, the rate specified in the notice went into effect thirty days later. Several other notices of rate increase were filed by Freeport over the ensuing twelve months, again to conform its prices to the applicable national rates, and they also were allowed to go into effect following the thirty day waiting period. On October 31, 1977, Freeport's contract with MRT expired by its own terms and the sale of gas to MRT under the certification was abandoned under section 7(b) of the Act.

On March 16, 1978, almost five months after the contract expired, the Commission issued a Letter Order, rejecting Freeport's rate changes and ordering Freeport to refund the excess collected over the certificate rate. The Commission held that Freeport had no authority to file the notices of rate increase and that such increases were thus void. The Commission's order stated:

[A] certificate was issued [to Freeport] for a period of three years . . . at a fixed rate of 56¢ per Mcf . . . and an escalation of 1¢ per Mcf per year. Since the terms under which the certificate was issued did not expire until October 31, 1977, the notices of change to rates in excess of the rates specified in the certificate are improper and are hereby rejected as inconsistent with the intent of the limited-term certification procedure. Under the limited-term certificate, Freeport was permitted at the outset to collect a rate in excess of the then applicable ceiling rate [i. e., the national

rate] under Opinion No. 699, and was not required to obtain abandonment authorization upon the expiration of the subject terms. To now allow an increase in rates above those permitted under the limited-term certificate with no corresponding benefits accruing to the consumer would clearly not be in the public interest. Having accepted the benefits of the limited-term certification procedure, Freeport must also accept whatever burdens may result from the use of that procedure. All available copies of the notices of change are herewith returned to Freeport. This action is consistent with Commission precedent. See *South Louisiana Production Company, Inc. et al.*, Docket No. CI76–208, *et al. Order Denying Petition*, etc., issued August 2, 1977. Cf. Opinion Nos. 706 and 706–A, 52 FPC 767, 1312, together with the order issued May 14, 1976 in that case; affirmed without opinion in *Texas Gas Exploration Corp. v. F.P.C.*, 561 F.2d 1022 (CADC, 1977).

Record at 161.

Freeport petitioned the Commission for a rehearing. The petition was denied on August 28, 1978. In its order denying rehearing, the Commission reinforced its Letter Order of March 16, 1978. The Commission stated, first, that Freeport had no right, other than a right granted in the certificate, to file a rate increase. "The rate applicable to a limited term sale of gas is determined with reference to the order of the Commission authorizing such sale, and area or national rates are applicable only if permitted by such order." Record at 219. The Commission concluded by saying that the "principles applicable to (rule 2.70) limited term certificates are similar to those applicable in (rule 2.75) optional procedure cases." Record at 220. From FERC's order denying rehearing, Freeport filed the petition for review now before us.

## II

Freeport argues that the Commission's order denying Freeport's rate increases is

based on the Commission's misapplication of the Natural Gas Act and Rule 2.70. Freeport's argument is simple and straightforward, and we accept it. Its argument is, first, that section 4 of the Act gives a producer, operating under a section 7 certificate, an absolute right to file a section 4 notice of rate increase and to collect the increased rate if it is just and reasonable. That Freeport qualified as a section 7 certificated producer is not in dispute. Second, Freeport contends that rule 2.70, at the time the notices of rate increase were processed, did not bar a producer certificated for a limited term under that rule from filing section 4 rate increase notices. Third, and finally, Freeport contends that its certificate did not limit its right to seek rate increases under section 4; therefore, when the national rate came into effect, it was entitled to the benefit of that rate. The Commission and Laclede, which has intervened in behalf of the Commission, join issue with Freeport on these last two points. We take them up in order.

## A. Rule 2.70

■ As we have discussed, a producer who receives a certificate of public convenience and necessity by invoking the rule 2.75 procedure, and thereby may obtain a rate in excess of the applicable ceiling rate, is barred from seeking a later rate increase under section 4. He foregoes his section 4 right to rate increases because it is anticipated that the higher-than-ceiling rate he obtains on certification will not be lowered. The Commission utilized this quid-pro-quo rationale of rule 2.75 to deny Freeport's rate increases. The fact that Freeport's certificate had issued under rule 2.70, rather than rule 2.75, was apparently irrelevant. What mattered to the Commission was that Freeport had obtained a higher-than-ceiling rate on certification. Having received that rate, the Commission reasoned, Freeport had to give up something in return; its right to file for a rate increase under section 4 was the logical sacrifice.

The Commission has cited no language in rule 2.70, and we find none, to support the notion that a producer certificated under the rule's procedures automatically waives his section 4 rights. Nor do the Commission's orders denying Freeport's section 4 rate increases and denying rehearing state in unequivocal terms that rule 2.75's preclusion of rate increases under section 4 should be read into rule 2.70. The two orders nevertheless stand for the proposition that the rule 2.75 preclusion applies in rule 2.70 cases because the orders are based on *Texas Gas Exploration Corp.*, Opinion No. 706, 52 F.P.C. 767 (Sept. 17, 1974), *rehearing denied*, Opinion No. 706–A, 52 F.P.C. 1312 (Nov. 13, 1974), *aff'd without opinion, Texas Gas Exploration Corp. v. FPC*, 561 F.2d 1022 (D.C.Cir. 1977), and the following language: "The principles applicable to limited-term certificates (rule 2.70) are similar to those applicable in optional procedure (rule 2.75) cases. A producer must accept the burdens as well as the benefits of the limited-term procedures." Record at 220. *See* p. 711, *supra.* "Having accepted the benefits of the limited-term certification procedure, Freeport must also accept whatever burdens result from the use of that procedure." Record at 161. In our view, neither *Texas Gas* nor the statements we have quoted support the proposition that rule 2.75's barring of section 4 rights applies in rule 2.70 certification proceedings.

The *Texas Gas* case involved a rule 2.75, not a rule 2.70, certification. Texas Gas, a producer proceeding under rule 2.75, asked for rate of 45¢ per Mcf, three cents above the national rate. While Texas Gas's application was pending, the Commission allowed Texas Gas to commence deliveries at the 45¢ rate. Seventeen months later the Commission granted Texas Gas a rule 2.75 certificate, finding the 45¢ rate to be just and reasonable. During the period in which the Texas Gas application was pending, an area rate in excess of 45¢ was promulgated, and Texas Gas, after its certificate had issued, moved to withdraw, retroactively, its rule 2.75 application and to substitute an application for certification under section 7, with an area rate. The Commission ruled:

> We deny [the] motion. Grant thereof would permit [Texas Gas] the benefit of

choosing the most advantageous (to it) of the two certification procedures [*i. e.*, section 7 and rule 2.75] authorized by the Commission, without any resulting benefit to the purchasing pipeline or gas consumers dependent thereon. We hold to the basic premise of [rule 2.75], that a producer may benefit under one procedure but not under both. [Texas Gas] has sought, and been granted, the benefits of the optional procedure. It has, for example, been permitted to make sales at rates above the area ceiling for almost eleven months, and clearly this was possible only because [it] proceeded under [rule 2.75]. Having taken and enjoyed the benefits, [Texas Gas] may not renounce the burdens of [rule 2.75].

52 F.P.C. at 770–71

The Commission relied on the *Texas Gas* case not for its precedential value in a rule 2.70 context but for its benefits-versus-burdens, quid-pro-quo rationale. The question thus becomes whether the rationale for rule 2.75—that to obtain a higher-than-ceiling certified price a producer must waive his section 4 right to seek future price increases—also served as the underpinning for the promulgation of rule 2.70. We think it did not.

Rule 2.70 was adopted by the Commission at a time when the interstate natural gas market was facing extreme shortages. The rule was, and is, an emergency measure. To induce a producer to enter the interstate market, the Commission held out a bonus—a price higher than the applicable ceiling rate, a price attractive enough to draw the gas from the lucrative intrastate market. A producer with a rule 2.70 certificate knew that his bonus would last no longer than it took the Commission, proceeding under section 5, to promulgate an area or national rate. Once such a rate became effective, the producer's price would be adjusted to conform to that rate, and he would be in the same position as a producer who had been certificated under section 7; the bonus would thus come to an end. Not only did the producers, and the Commission, contemplate that section 5 proceedings would impact to lower the rates chargeable under a rule 2.70 certificate, they also contemplated that section 4 would operate to raise those rates.[17]

The difficulty with the argument that the quid-pro-quo rationale of rule 2.75 is applicable in a rule 2.70 context becomes apparent on examination of rule 2.75 and its purposes. The rule was not adopted as an emergency measure, but as a measure designed to attract permanent dedications of natural gas to the interstate market, with or without pregranted abandonment. The rule resembles rule 2.70 in but one respect: the gas may enter the interstate market at a price in excess of the applicable ceiling rate. But there the similarity of the workings of the two procedures comes to an end. Whereas a rule 2.70 producer faces the risk that his price may be reduced, a rule 2.75 producer does not, since he is guaranteed that his price will not go down. At the same time, his customers are guaranteed that their price will not go up. The rule 2.75 producer pays for his price stability by foregoing his section 4 right to seek a price increase in the future. That is his quid-pro-quo, or the "burden" he assumes for the "benefit" he receives, as the Commission puts it. As for the rule 2.70 producer, the "burden" he assumes—a possible price de-

---

**17.** The notion that rule 2.70 was not designed as a procedure to establish just and reasonable rates was expressed by FERC Commissioner Moody in his dissenting opinion in *Application of Atlantic Richfield Co.*, Docket No. C173–691, 50 F.P.C. 625, 629 (Aug. 30, 1973) (Moody, Commissioner, dissenting). "I accept as an undisputed premise that [rule 2.70], as promulgated and administered by this agency, is not rate regulation within the meaning of Sections 4 and 5 of the Natural Gas Act. I think it without question that certificate applications under [rule 2.70] involve no determination of just and reasonable rate . . . ." .

Consequently, just and reasonable rates chargeable under a rule 2.70 certificate could be established only in the context of sections 4 and 5 proceedings. On the other hand, Rule 2.75 is an independent rate proceeding, and once a just and reasonable rate is established thereunder, it may be argued that the results of a section 5 national or area rate proceeding would be superfluous.

crease—is his quid-pro-quo for the "benefit" that he may obtain in the form of a future price increase under section 4.[18]

B. The Certificate

■ Having concluded that the rule 2.70 procedure does not operate to bar section 4 rate filings, we turn to Freeport's certificate to determine whether it some how precluded Freeport's right to file for rate increases. The Commission clearly had the power to impose such a preclusive condition in issuing Freeport's certificate, since section 7(e) of the Natural Gas Act authorizes the Commission "to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require."

This power to alter the rate structure agreed on by the parties is not unlimited, however. The contract rates should be modified "only 'in circumstances of unequivocal public necessity.' *Permian Basin Area Rate Cases (Continental Oil Co. v. FPC)*, supra, note 5, 390 U.S. at 822, 88 S.Ct. at 1388–1389, 20 L.Ed.2d at 367 . . . ." *Appalachian Power Co. v. FPC*, 529 F.2d 342, 345 n.13 (D.C.Cir.), cert. denied sub nom., *Kentucky Utilities Co. v. FPC*, 429 U.S. 816, 97 S.Ct. 58, 50 L.Ed.2d 76 (1976). We should bear in mind, in construing the Act, "that it evinces no purpose to abrogate private rate contracts as such. To the contrary, by requiring the contracts to be filed with the Commission, the Act expressly recognizes that rates to particular customers may be set by individual contracts." *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 338, 76 S.Ct. 373, 378, 99 L.Ed. 742 (1956).

In considering the question whether the certificate effected a change in the rate structure established in Freeport's contract with MRT, we begin with the observation that the certificate contains no reference to the contract's area rate clause that, as far as Freeport and MRT were concerned, gave Freeport the right to perfect the rate increase filings in question. Nor is there any language in the certificate that refers to Freeport's rights under section 4 of the Act. The Commission submits that explicit references to the area rate clause or Freeport's section 4 rights was unnecessary because "under the terms of the certificate, Freeport's rates were fixed and further escalations above those fixed rates were unauthorized." Commission's brief at 10. What the Commission is saying is that the area rate clause was abrogated by implication.

In the certificate order, the Commission stated: "It therefore seems imperative that we grant the *requested certificate*, though of limited duration, in order that the additional supplies needed by MRT can potentially be committed to the interstate market on a long term basis." Record at 79. Freeport sought certification of its entire contract with MRT, including the area rate clause. In view of the Commission's statement that the requested certificate was being granted, it is, for us, difficult to accept the Commission's argument that the rate-fixing provision of the certificate, which made no reference to the area rate clause, or section 4, can be said to have impliedly written that clause out of the contract. The implied-modification argument becomes even more difficult for the Commission when it is remembered that the Commission's power to attach conditions to a certificate of public convenience and necessity "must be supported by soundly-based findings in the record . . . ." *Pure Oil Company v. FPC*, 292 F.2d 350 (7th Cir. 1961). See *California Oil Co., Western Div. v. FPC*, 315 F.2d 652, 656 (10th Cir. 1963); *Michigan Consolidated Gas Co. v. Panhan-*

18. The Commission argues that the rule 2.70 device does not operate in the public interest unless the consumer, who ultimately pays for the incentive bonus, can extract a payment from the producer in exchange for the bonus. The Commission regards the preclusion of a producer's section 4 rights as that payment. Of course, if a producer must pay for his incen- tive bonus, it is no bonus. But if some consideration must be forthcoming from the producer, it can readily be found in his removing his gas from the intrastate market, where he could freely implement price increases authorized by his sale contract and would not be subjected to the possibility of price decreases as a result of Commission action under section 5.

*dle Eastern Pipe Line Co.*, 226 F.2d 60, 67 (6th Cir. 1955). In this case there are no findings to support any condition setting aside the area rate clause and section 4 rights.

We think the Commission's best argument is that the rate-fixing provision of the certificate order is ambiguous, and, when construed to reflect the intention of the parties, abrogates future rate increases. The interpretation of a certificate order is like construing a contract, the issue being: "What did the parties mean? . . ." *Mitchell Energy Corp. v. FPC*, 519 F.2d 36, 40 (5th Cir. 1975). We think it entirely fair to say that had the Commission advised Freeport, in unambiguous words, that a certificate would not issue unless Freeport forewent its rights under the area rate clause and section 4, Freeport would have rejected the proffered certificate and would have sold its gas intrastate at a higher price. The Commission acknowledged that that would have been Freeport's course of action when, in the certificate order, it said: " . . . it is a reasonable inference from the record herein that the gas will be sold to the intrastate market unless our approval is obtained forthwith. In view of this fact, we deem it necessary and required by the present and future public convenience and necessity *to issue the certificate as requested.*" *Limited-Term Certificate to Freeport Oil Co.*, Docket No. CI74–78, 52 F.P.C. 1141, 1144 (Oct. 31, 1974) (emphasis added). We must conclude that the parties, and the Commission, intended the area rate clause to apply and that Freeport would file for the rate increases in question.

If the Commission had wanted to impose the condition it now urges us to find, it could have looked to three previous limited-term certificate orders, wherein it foreclosed future rate increases, as models. Those limited-term certificates were issued in *Belco Petroleum Corp., Agent*, Docket No. CI74–100 (December 3, 1973) and Docket No. CI74–489 (May 9, 1974), to *James M. Forgotsen, Sr.*, Docket No. CI73–847 (September 4, 1973) and to *Charles A. Barton,*

*Sr.*, Docket No. CI73–239 (November 17, 1972). In each of the certificates, the Commission, as it did in Freeport's case, set forth the then applicable price but, in striking contrast to Freeport's certificate, the Commission added an ordering paragraph, *e. g.*:

> The rate set forth . . . above shall remain in effect for the term of the authorization granted herein. In no event shall said rate exceed 42.0 cents per Mcf for gas with a Btu content of 1000 Btu per cubic foot.

*Belco, supra*, Docket No. CI74–100; and,

> In the event Applicants commence service pursuant to this conditioned limited-term certificate, the conditioned rate of 35.0 cents per Mcf shall remain in effect until changed by the Commission.

*Charles A. Barton, Sr., supra*, Docket No. CI73–239. A reading of the certificate before us demonstrates not only that the "condition" now urged by the Commission cannot be inferred, but, also, that there is noticeably absent from the certificate the express language employed by the Commission in the past when it desired to preclude price increases in limited-term certification proceedings.

In summary, we find that Freeport had the right to move its prices to the national rates promulgated by the Commission, under the limited-term certificate in question. The Letter Order denying Freeport that right and the Order Denying Rehearing of the Letter Order are, therefore, VACATED.